**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **JOSHUA LANKFORD,** | * | **CRIMINAL NO. CCB-19-0371** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S OPPOSITION**
**TO DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND FOR PRE-TRIAL RELEASE**

On May 6, 2020, the Government filed an Opposition to Defendant's Motion to Reopen Detention Hearing and for Pre-Trial Release (ECF 76), under seal. The defendant's Memorandum in support of Motion to Reopen Detention Hearing and for Pre-Trial Release had been filed under seal, at ECF 73, on May 4, 2020. The Court has requested that counsel file amended pleadings redacting only portions of the memoranda which need to be sealed (ECF 78).  This redacted Memorandum, with exhibits, is filed on the public docket to comply with that Order, and the complete, unreacted memorandum will be filed under seal.

In complying with this Court's Order regarding re-filing and redacting, the defendant has similarly filed a subsequent Memorandum in Support of Motion to Reopen Detention Hearing and for Pretrial Release (Redacted version at ECF 79, Attachment 1; unredacted, sealed Memorandum at ECF 81), which made changes to Section J of his original Memorandum regarding the defendant's release plan.  Because of those changes, the Government feels compelled to supplement argument in response, which can be found in Section II. D. of this motion, *infra* at pages 20-21.  The only other change between the instant Memorandum and the Government's

Memorandum in Opposition to Defendant's Motion to Reopen Detention Hearing and for Pre-Trial Release filed on May 6, 2020 can be found in footnotes 1 and 2.

On May 4, 2020, the defendant, who is currently housed at Chesapeake Detention Facility ("CDF"), filed a motion to reopen detention hearing and for pre-trial release.  The only novel claim in this motion is that COVID-19 is a changed circumstance meriting the defendant's release.  This Court has recently denied similar claims by detainees housed in the Chesapeake Detention Facility. *See United States v. Martin*, PWG-19-140 (D. Md.), ECF 209 (Order by Judge Grimm); *United States v. Branden Jones*, RDB-18-0339 (D. Md.), ECF 588 (Order by Judge Bennett); *United States v. Daniel Blue,* ELH-19-0286 (D. Md.), ECF 413 (Order by Magistrate Judge Gesner); *United States v. Van Cleve Ashley,* RDB-06-0034 (D. Md.), ECF 107 (Order by Judge Bennett). Likewise, this Court and the United States District Court for the District of Columbia have denied motions filed by defendants detained in District of Columbia Department of Corrections facilities. *See United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Gray*, GJH-19-407, ECF No. 120 (Order by Judge Hazel); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020.

Because the defendant has failed to make a sufficient factual showing to merit the relief sought, this Court should do the same and deny the motion, without a hearing.

## PROCEDURAL HISTORY

On August 1, 2019, a Grand Jury in the District of Maryland returned a four-count Indictment against Joshua I. Lankford, Lakeya Aldridge, and Kevonne Murphy, charging each of

them with Conspiracy to Commit Sex Trafficking in violation of Title 18 U.S.C. § 1594(c); Sex Trafficking, in violation of 18 U.S.C. § 1591(a), (b)(1); Conspiracy to Commit Kidnapping and substantive Kidnapping, in violation of 18 U.S.C. § 1201(a) and (c).

On August 5, 2019, the defendant had an initial appearance and a full detention hearing. The Government set forth substantial evidence in favor of detention, including the violent nature of the defendant's actions in this case, his leadership role in the offenses, and the violent nature of his prior criminal contacts and convictions. At the conclusion of the hearing, and after hearing thorough argument from defense counsel regarding release, Chief United States Magistrate Judge Beth P. Gesner ordered the defendant detained in the custody of the United States Marshals Service pending trial. (ECF 15). Judge Gesner found that there was no condition or combination of conditions which would reasonable assure community safety, specifically enumerating as additional reasons for detention: "(1) Nature and circumstances of offense; (2) Def's role in the offense; (3) Weight of the evidence; (4) Criminal history- handgun, assault, life threatening injury, violation of ex parte/prot. Order; [and] (5) Poor adjustment to community supervision –re-arrests while on supervision." *Id*.

On March 12, 2020, a Grand Jury for the District of Maryland returned a ten (10) count Superseding Indictment against the defendant, adding multiple counts of Coercion and Enticement, in violation of 18 U.S.C. § 2422(a), Transporting an Individual in interstate commerce to Engage in Prostitution, in violation of 18 U.S.C. § 2421, and Interstate Travel to Promote Enterprise Involving Prostitution Offense, in violation of 18 U.S.C. § 1952(a)(3).

## FACTUAL BACKGROUND

Despite the defendant's attempt in his Memorandum in Support of Motion to Reopen Detention Hearing to grossly underrepresent the severity of the offenses in this case and the

defendant's role in those offenses, as noted *supra*, Judge Gesner agreed with the Government's representation at the August 5th detention hearing, finding that the nature and circumstances of the offense and the defendant's role in the offense weighed in favor of detention. (ECF 15).

The defendant preyed upon a victim, K.A., whom he knew to be vulnerable and suffering from a severe drug addiction, and lured her into performing commercial sex acts under his direction with the promise to K.A. that he would help her make more money in order to buy a house and attain custody of her son, neither of which he had any intention of assisting with. The defendant told K.A. that she would have to give all of the money she made from the commercial sex acts to him directly. The defendant, after being the sole recruiter and trafficker of K.A. for a period of time, then recruited, one-by-one, Kevonne Murphy ("Murphy), Lakeya Aldridge ("Aldridge), and David Goodwin ("Goodwin"), to join the conspiracy to engage in sex trafficking of K.A.

On or about October 25, 2018, the defendant, Aldridge, and Murphy drove K.A. from Federalsburg, Maryland to Laurel, Delaware, and checked into a hotel room at the Relax Inn. On October 27, 2018, K.A. was then driven to the Sunrise Motel Room in Seaford, Delaware, where she stayed for one day before being driven back to the Relax Inn on or about Sunday, October 28, 2018. K.A. engaged in commercial sexual acts for money at both of these hotel rooms. K.A. was required to give the money she made from the commercial sexual acts to either the defendant, Aldridge, or Murphy.

On or about October 29, 2018, K.A. was driven back to Maryland where she performed commercial sex acts and was required to give all of the money to the defendant, Aldridge, Murphy, and/or Goodwin. After one commercial sex act, the defendant, Aldridge, Murphy, and Goodwin became enraged at K.A. for having taken too long at that particular location in comparison to the amount of money she had made, which they felt was not sufficient.

At the direction of the defendant, Aldridge drove the defendant, Murphy, Goodwin, and K.A. to railroad tracks at a very remote location in Federalsburg, Maryland, for the purpose of physically assaulting K.A. as punishment and to maintain her compliance.  To prevent K.A. from escaping the vehicle, a belt was placed around her neck while in the vehicle. While parked at the railroad tracks, K.A. was ordered out of the vehicle. K.A. was then beaten with closed fists about her face, torso, and neck.  K.A. was also repeatedly and violently struck about her unclothed buttocks with the belt.  The defendant and his co-conspirators then immediately transported K.A. to the Relax Inn in Laurel, Delaware, with the defendant and Goodwin gripping the belt around K.A.'s neck throughout the car ride back to Delaware.

Once inside the hotel room, K.A. was not permitted to put on any clothes for the remainder of the evening and was forced to take a cold shower.  At one point, at least one other patron of the hotel came into the room, and the defendant forced K.A., still unclothed, to stand up and spin around so that the gentleman could see her and determine if he wanted to pay the defendant and his co-conspirators to engage in commercial sex with K.A.

During this same evening, on or about October 29, 2019, the defendant initiated the drafting of a list of sex acts that K.A. would be required to perform as things moved forward, and attempted to set prices in order to lend more structure to the enterprise.  This sex act list was later recovered during a of the motel room at the Relax Inn. The list was drafted on the defendant's notepad, which had been in a book bag he carried with him.

On October 30, 2018 at approximately 8:30 a.m., K.A. was able to place a frantic call to 911 by accessing Aldridge's cell phone without her knowledge. Upon arrival at the hotel room, Delaware State Police troopers knocked on the door and Murphy opened the door. Troopers were able to see K.A. standing behind Murphy and indicating that she was in distress. K.A. was wearing

only a bed sheet and had visible injuries to her forehead, neck, and jaw.  K.A., Murphy, Goodwin, and Aldridge were escorted from the hotel room. Cellular telephones were seized from Murphy, Goodwin, and Aldridge.  K.A. was immediately transported to the hospital for treatment of her injuries.

The defendant had left the hotel room prior to police arrival, and he was taken into custody on October 31, 2018 in Federalsburg, Maryland, at the same residence where he proposes to live if released.  His cellular telephone was seized at that time.   A Delaware State subpoena request was issued for the toll records associated with the cellular telephones seized in this investigation. Toll record analysis showed daily communication in the form of text messages and telephone calls between Lankford, Aldridge, and Murphy from October 25, 2018 through October 30, 2018. Investigators obtained search warrants for the cell phones, and the analysis of multiple phones demonstrated that the content of much of the cell phone communication among the co-conspirators during this timeframe was regarding the maintenance and advertisement of K.A. for commercial sex.

## ARGUMENT

The defendant relies on the *prospect* of a mass COVID-19 outbreak at the Chesapeake Detention Facility ("CDF") in Baltimore to justify his release.  To date, there have been no documented cases of detainees having contracted COVID-19 while already housed at the facility. There has been only a single documented case of COVID-19 among inmates at the facility, and that case involved an individual who had contracted COVID-19 prior to arrival at CDF, and who was found to be positive during intake and placed into quarantine thereafter.[1]   There is no

---

[1] The single inmate, who arrived at CDF on May 8, 2020, was placed in isolation after exhibiting a cough and fever.  That inmate had been placed in intake quarantine since arrival, per DPSCS guidelines.  There is no reason to believe, as of this writing, that there has been any COVID-19

indication of any spread of COVID-19 at CDF, and, even if there were, the defendant's motion must be denied, without a hearing.

## I.        Legal Standard

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Chief Magistrate Judge Gesner relied in ordering detention on this basis. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(D).

## II.       The Defendant's Motion Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention.

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

### A. The Nature and Circumstances of the Offenses, the Weight of the Evidence, History and Characteristics of the Defendant, and The

---

exposure beyond that quarantined area. The government will continue to receive information from DPSCS on this issue.

There have been, as of May 12, 2020, four reported cases of CDF staff testing positive for COVID-19, but no indication that the illness had spread from those individuals to other staff or to any inmates. The most recent staff cases have involved a correctional officer who tested positive for COVID-19 on May 5, 2020, but had last been at work on April 24, 2020; and a contract nurse who had last been at work on April 26, 2020, and tested positive on May 2, 2020.

**Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release.**

In addition to the compelling evidence described above regarding the defendant's dangerous conduct in this case, the defendant admitted in his *Mirandized* recorded interview that he was in the vehicle as he and his co-conspirators drove K.A. back to Delaware with a belt around her neck. He stated that Aldridge had told K.A. that if she said anything about it, Lankford was already out for murder. Mr. Lankford was asked whether his murder case was used to motivate K.A. to act right, and he said, "yes." The defendant admitted to receiving money from K.A.'s performing sex acts, but claimed he had severed ties because he was not making enough money. The weight of the evidence against the defendant is extremely strong.

In 2008, the defendant was convicted of handgun on person and received a Probation Before Judgment. In 2010, he was convicted of causing life threatening injury by vehicle (as part of a negligent homicide by auto/boat case). In 2013, the defendant was convicted of marijuana possession, and received a fourteen month suspended sentence and was placed on probation for one year. That same year, the defendant was convicted of second degree assault and received a probation before judgment.

In 2016, the defendant was convicted of violating a protective order and received a sentence including active incarceration. This is of particular concern because in order to even obtain a protective order in Maryland, one must show either: an act that causes serious bodily harm, an act that places a person in fear of imminent serious bodily harm, assault, rape or sexual assault, false imprisonment, mental injury to a minor child, or stalking. Not only was the victim granted a protective order based on one of these criteria, but the defendant was then convicted of violating one or more of the conditions imposed by this court order.

In late 2016, the defendant was charged with first degree murder and related charges.  The defendant was acquitted after a jury trial in August of 2018, and was released from Wicomico County Detention Center on August 22, 2018, just weeks before he began trafficking K.A. by force, fraud, and coercion.  The defendant acknowledged when interviewed that his acquittal on this murder charge was used as a means of intimidation of K.A.  Based on his history of violating court orders and history of intimidation, it is extremely likely that we can count on the defendant doing both of these things if he is released from pre-trial detention during the pendency of this case.

**B.  Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak.**

The defendant focuses almost exclusively on the health risks posed by the COVID-19 outbreak and ignores the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis.  18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  Currently, there has not been any cases of detainees having contracted COVID-19 while housed at CDF.  The defendant does not have COVID-19.  The defendant does not allege that he has been exposed to any individuals with COVID-19.  In this way, he is not seeking release based on his *actual* physical health.  Instead he relies solely on the *possibility* of becoming infected.  As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[2]

---

[2] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Riser.

**C. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak.**

While the defendant would have the Court believe that "the steps taken to prevent the spread of the virus at CDF largely remain a mystery" as stated in his motion, CDF has been forthcoming regarding its preventative measures, and these measures have been directly communicated to the Federal Public Defender's Office on at least one occasion.[3]  Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[4]  DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention ("CDC") and Maryland Department of Health ("MDH") regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities.  They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza.  When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, *including CDF*, did not suffer any outbreaks.

---

[3] See Exhibit 1, attached hereto, containing a letter dated April 30, 2020 from United States Marshal Johnny L. Hughes addressed to "Public Defender Wyda" wherein pages 2 through 6 delineate the measures taken at CDF to prevent the spread of COVID-19 and protect inmates.

[4] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulted in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[5]:

- *Social Visitation*. DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[6] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone. Two nurses are stationed at the entrance of CDF to ask the standard COVID-19-related health questions and take temperatures of anyone who enters the facility. Moreover, as a practical matter, virtually all attorney-client communications occur via teleconference.

- *Detainees Entering the Facility*. Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new federal arrestees who present a particular safety risk to the community. CDF, moreover, is not receiving any new detainees from other DPSCS facilities.[7]

- *Screening Procedures*. In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for 14 days, where within two hours of arrival, he will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population. The detainee will also be screened by a medical professional a second time following the detainee's arrival.

- *Detainees 50 Years of Age or More*. Detainees who are 50 years of age or more are now being housed in a separate unit. In addition, the medical staff is taking temperature readings of such detainees three times a day. Detainees who are 50 years of age or more in the Protective Custody Unit are remaining in the Protective Custody unit; however, the medical staff is taking three temperature readings a day for such detainees.

---

[5] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[6] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per week to ensure that each detainee is able to remain in contact with friends and family members. DPSCS is also in the process of implementing social visits via video conference.

[7] As discussed above, a single inmate was identified as COVID-19 positive upon entry at CDF, and was placed into quarantine.

- *Detainee Movement*. The Court's Standing Order 2020-07, issued April 10, 2020, postponed all criminal trials and non-emergency proceedings scheduled to commence through June 5, 2020. This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies. In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever. To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene*. Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day. Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently. The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning. In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched. DPSCS also is producing substantial quantities of sanitizer at a facility in Hagerstown, to ensure that it has an adequate supply. Finally, and importantly, each Correctional Officer has received a sneeze guard (protective mask), and are required to wear it at all times. Each detainee has also received his/her own sneeze guard.

- *Quarantine*. DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers*. Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

Along with the above, DPSCS has issued a series of memoranda, directives, and notices of standard operating procedures to limit any spread of the COVID-19 virus in its facilities, including the Chesapeake Detention Facility.  A series of such directives are attached to this memorandum, and state as follows:

- Information Bulletin dated March 9, 2020 announces general COVID-19 preventative measures provided to CDF inmates.  It provides for and outlines an increase in cleaning efforts.  It also informs inmates of the cleaning precautions they can take to prevent the spread of the virus.  The bulletin also advises inmates to let staff know if they feel sick or have cold or flu-like symptoms (attached as Exhibit 2).

- Information Bulletin dated March 9, 2020 announces general COVID-19 preventative measures provided to CDF staff.  It provides information about how the staff will increase cleaning efforts.  It also informs staff of the cleaning precautions they can take to prevent the spread of the virus and indicates that it is to be read during roll call for ten consecutive days and posted for all staff to view.  The bulletin also instructed staff to report sickness or cold or flu-like symptoms (Exhibit 3).

- Information Bulletin dated March 12, 2020 directs all staff, vendors and contractors to use hand sanitizer upon entry and at various points in the facility (Exhibit 4).

- Memorandum dated March 18, 2020 announces the emergency suspension of medical fees (Exhibit 5).

- SOP dated March 21, 2020 (Exhibit 6) establishes measures for transporting an infectious or potentially infectious inmate.  The SOP advises staff of the need to perform proper hygiene on themselves; states the need to ensure an inmate has done the same; lists steps to take to ensure proper ventilation in a transport vehicle; and identifies cleaning measures to take after transport.

- SOP dated March 25, 2020 (Exhibit 7) provides for isolation and quarantine areas, and states the procedures applicable to those locations.  The SOP states that housing unit officers must ensure rooms have signage with information on respiratory infection isolation room precautions, PPE donning and doffing, and droplet precaution.  The SOP provides for an isolation room, the doors to which should remain closed.  Medical equipment like blood pressure cuffs and thermometers are inside the room.  The SOP states measures that must be taken to keep isolation area clean.  The SOP also, of course,

provides that inmates must stay in the group, isolation area, or quarantine area assigned to them.

- SOP dated March 31, 2020 (Exhibit 8) addresses the use of PPE, and implements policies for quarantine and isolation. The SOP provides for employee entry procedures such as temperature check, interview, and PPE; screening procedures for incoming inmates such as temperature check and PPE; quarantine procedures for asymptomatic inmates including quarantine if identified as having been exposed and wearing mask for fourteen days; and procedures for insolation of inmates who have tested positive for COVID-19 or are suspected of having COVD-19.

- Memorandum dated April 4, 2020 (Exhibit 9) establishes return to work procedures. Per the policy, staff who have self-quarantined should return to work within 72 hours if they are not exhibiting symptoms. Staff under observation for COVID-19 shall continue to work while wearing PPE and conduct regular temperature checks.

- Memorandum dated April 7, 2020 directs all staff to wear face shields, gloves and mask at all times (Exhibit 10). The memorandum also directs the provision of such PPE, and also provides guidance on PPE maintenance.

- Information Bulletin dated April 10, 2020 directs that detainees maintain a social distance of six feet, wash hands, wipe down areas in the housing unit, and sleep head to foot to increase distance between cellmates (Exhibit 11).

- Memorandum dated April 20, 2020 gave instructions on shortening beard length for effective use of Personal Protective Equipment ("PPE") (Exhibit 12).

- Memorandum dated April 22, 2020 sets the Standard Operating Procedures for the Environmental Compliance Safety Officers (Exhibit 13). The SOP helps the ECSOs ensure temperature checks for each person that enters the facility; screening questions asked at points of entry; provision of PPE to staff members; social distancing for inmates, with no more than 10 inmates in an area at a time; maintenance of 6-foot separation between inmates and staff; use of PPE by medical staff; and issuance of face masks to inmates.

- Memorandum dated April 23, 2020 provided for release procedures in light of COVID19 (Exhibit 14).

- Memorandum dated April 27, 2020 provides notice that staff will be offered an N95 mask for voluntary use (Exhibit 15).

- Directive dated April 29, 2020 establishes procedures governing administrative segregation housing and discipline during the COVID-19 situation (Exhibit 16). Essentially, the policy calls for the facilities to take into consideration the COVID-19 situation and health concerns before moving an inmate to a different cell.

Records provided by CDF also reflect that the facility is making efforts to implement the aforementioned policies. An inspection was conducted at CDF, and the inspection reports indicate that CDF is taking reasonable, appropriate precautions and is making a reasonable effort to implement the COVID-19 policies discussed above. Specifically, the CDF audit (Exhibit 17) found, among other things, that the facility was properly screening individuals entering the facility, staff were maintaining appropriate social distancing, and that staff were making use of PPE. The ESCO walk-through audit (Exhibit 18) reported that the facility has appropriate signage throughout the facility, staff were appropriately using PPE, cleaning supplies were available, and social distancing was being maintained. The Intelligence and Investigation Division audit (Exhibit 19), likewise, found that staff members were appropriately using PPE, social distancing guidelines were being followed, and individuals entering the facility were being appropriately being screened.

In addition, as referenced, on April 30, 2020, Johnny Hughes, the United States Marshal for the District of Maryland, provided a letter to the Federal Public Defender James Wyda in response to his correspondence regarding prisoners held in pre-trial detention.

In sum, the information, policy documents, and audit/inspection reports set forth above indicate that DPSCS and CDF have prepared reasonable measures to address the COVID-19 situation, and are making reasonable efforts to enforce those policies.

**D. The Defendant's Individual Circumstances Do Not Merit Release.**

█████████████████████████████████████████████

███████████   By virtue of being in a detention facility, the defendant is in the presence of medical professionals at all times.  Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees ████████████████████████ ██████████████████   There are multiple points of access for detainees ███████████ ████████████   to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses.  ██████████████████████████████ ████████████████████████████████.  DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for ██████████████████   chronic diseases.  In addition, clinical pharmacists are on call at all times, day or night.  If the defendant should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.  DPSCS contractor, Corizon Health, has COVID-19 test kits, the ability to quarantine prisoners suspected of COVID-19, and procedures to transport prisoners suspected of COVID-19 to local hospitals for further testing and treatment if needed.

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

Between the medical professionals at CDF and the medical professionals at the hospitals, the defendant has access to all of the care that he needs. ████████████████████████████ ██████████████████████████████ In the unlikely event that the defendant becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And if the defendant needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional.  In short, there are sufficient resources, both inside and outside CDF, to ensure that the defendant's medical needs are addressed.

Indeed, when faced with a similar motion for release based on COVID-19, ████████████ ████████████████████████████████████████████ Judge Grimm denied the motion for release **without a hearing**.  *Martin*, PWG-19-140 (D. Md.), ECF No. 209 (denying motion for pretrial release by detainee suffering from "diabetes, high blood pressure, asthma, and pain").  *See also, e.g., Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (denying a ███████ motion by a defendant suffering from diabetes, even though "experts on COVID-19 have stated that individuals with diabetes are at a higher risk of experiencing more serious complications if infected with the virus"), *aff'd* ECF No. 92 (Order by Judge Chuang); *Parker*, TDC-18-344 (D. Md.), ECF No. 478 (denying motion for pretrial release by a detainee who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection"); *Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (asthma); *Williams*, PWG-13-544 (D. Md.), ECF

No. 94 (67-year-old defendant); *Gray*, GJH-19-407, ECF No. 120 ("open heart surgery as a child, requires regular EKGs, and continues to experience a diminished immune system, heart flutters, and shortness of breath"); *Tucker*, GJH-19-555 (D. Md.), ECF No. 26 ("a respiratory condition (severe asthma), high blood pressure, and high cholesterol"; "Defendant at no point provides medical records which substantiate his claims"); *Christian*, DKC-20-19 (D. Md.), ECF No. 23 (asthma); *Pate*, PWG-17-236 (D. Md.), ECF No. 53 (asthma); *Attia*, PWG-19-193 (D. Md.), ECF No. 53 (asthma, migraines).

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Furthermore, the defendant's proposed placement outside of the facility does not eliminate the danger of contracting COVID-19. *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread of the virus in the general public as well"). In fact, the defendant already acknowledges that he is currently housed in a cell alone, and he proposes that if released, he will self-quarantine in a bedroom for 14 days before interacting with other residents of the home. The defendant also

asserts that if he chooses to leave his cell to recreate or exercise, it would be difficult to distance. If the defendant is truly merely concerned about the health risks of contracting COVID-19, then he should simply chose not to recreate or exercise with others at CDF, just as he proposes to self-quarantine in a bedroom upon release.

The defendant proposes that upon his release, he live with ████████████████████ ████████████████████████████████████ has a 1997 conviction in Caroline County for "Confine Unattended Child."   As the defendant notes in his May 14, 2020 memorandum, her driver's license is also currently suspended.

In his original Memorandum in support of Release (ECF 73), the defendant also candidly acknowledged that ██████████████████, "occasionally" resides at the residence. In the defendant's May 14, 2020 Memorandum, filed to comply with the Court's Order requesting that not all information in the document be unnecessarily redacted or sealed, any reference to ████████ ██████████████████████ The defendant does not represent that ████████ will now *not* be living at, or visiting, the residence. There is now simply no mention whatsoever of ████████.

Assuming the information provided to the Court by counsel on May 4, 2020 was accurate, the Government continues to note the following concerns, as outlined in its original Memorandum.

The assertion that ██████████ "occasionally" resides at the residence, implies that he leaves the home on and off, thus creating an added risk of bringing COVID-19 into the home where the defendant proposes to live. Without the ability to identify screening practices or concrete COVID-19 precautions at the residence, the limited and strictly enforced access to jails better "serves to minimize Defendant's COVID-19 exposure."  *United States v. Smoot*, Crim. No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020)." Indeed, the defendant's violations

while under court supervision demonstrate that, just as he could not be trusted to comply with the conditions of his supervision in prior cases, he cannot be trusted to adhere to the social distancing guidelines that are so necessary to protect not only his own health, but the health of the community. *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

Furthermore, defendant noted in his original Memorandum at ECF 73, that ███████████ "may" have a criminal record. Assuming this individual is the lone ████████████ that shows in Maryland Judiciary Case Search, with a date of birth of ███████████ does indeed have a criminal record. In 2014, he was convicted of Distributing Controlled Dangerous Substances, and again in 2019, ██████████ was convicted of possessing a Controlled Dangerous Substance (not marijuana), after having originally been charged with Possession with Intent to Distribute Controlled Dangerous Substances. ██████████ has several other criminal contacts as well.

### III.    Traditional Location Monitoring Is No Longer An Option for Pretrial Services.

Pretrial Services now has diminished ability to monitor defendants on home detention. Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts. Although other forms of home detention are still available, "none provides 24/7 monitoring and notification." Gibson-Bey, RDB-19-563 (D. Md.), ECF 2, at 3 n.2. Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed. This is of particular concern in this case, where the defendant proposes to be released to the same community (Federalsburg, Maryland) where he recruited his sex trafficking

victim and where the enterprise continued, particularly by way of taking the victim to a remote location for a horrific physical beating.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19.  See, e.g., United States v. McKenzie, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

### IV.    The Defendant's Sixth Amendment Right to Counsel is Not Infringed Upon by his Continued Detention, Particularly In Light of the Risks Previously Identified, Which Resulted in an Order of Detention.

While the defendant does not request temporary release under 18 U.S.C. § 3142(i), he does assert that his Sixth Amendment right to counsel is being infringed upon by his incarceration. Section § 3142(i) of the Bail Reform Act permits the "temporary release" of a pretrial detainee "in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."   Because the temporary release analysis is instructive, the Government notes that even under § 3142(i), release is disfavored and the defendant bears the burden of showing that temporary release is "necessary." *See United States v. Dupree*, 833 F. Supp. 2d 241 (E.D.N.Y. 2011); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).  Moreover, requests for temporary release cannot "be analyzed in a vacuum"; rather, the court must "balance the reasons advanced for such release against the risks that were previously identified and resulted in an order of detention."  *United States v. Cox*, No.

2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020); *see also United States v. Eley*,

No. 20 CR 78-3, 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) (compelling reasons under §

3142(i) must be balanced "against the risks that were previously identified and resulted in an order

of detention") (internal quotation marks and citation omitted).

Recently, in *United States v. Green*, CCB-19-0539 (D. Md. Apr. 15, 2020) (Coulson, J.),

the court addressed a § 3142(i) temporary-release request by an inmate at CTF who had

"underlying health conditions of asthma, high blood pressure and chronic obstructive pulmonary

disease[,] putting him at particular risk for complications should he contract [COVID-19]." *Id.* at

2. The court found, first, that temporary release was not necessary for preparation of the defense,

as "the restrictions imposed at CTF are reasonable, necessary, and temporary," and "all cases have

been postponed by this Court's most recent Standing Order through June 5, 2020." *Id.* at 5.

Turning to the question whether there was "other compelling need" for release, the court focused

on four factors: "(1) [t]he original grounds for detention; (2) the specificity of a defendant's

COVID-19 concerns; (3) the extent the proposed release plan is designed to mitigate or exacerbate

other COVID-19 risks to the defendant; and, (4) the likelihood that a defendant's release would

increase the COVID-19 risks to others." *Id.* at 5–6 (citing *United States v. Clark*, 2020 WL

1446895 (D. Kan. Mar. 25, 2020)). The court found that notwithstanding the defendant's

underlying health conditions, the other factors weighed against release. First, the original reasons

for detention were "strongly in the Government's favor." Second, the defendant's poor

performance on community supervision in the past raised concerns "not only that he would comply

with release conditions, but also that he would comply with advice from public officials and public

health experts regarding COVID-19 precautionary measures." *Id.* at 6. Finally, the court found

that the family members whom the defendant proposed as third-party custodians were not

"appropriate person[s]" within the meaning of § 3142(i) who could ensure the defendant's compliance with conditions of release. *Id.* at 6–7.

As far as the government is aware, every other judge in this district to have considered a request for temporary release under § 3142(i) based on the COVID-19 pandemic has denied it. *See United States v. Brown*, No. CCB-19-576, 2020 WL 1554059 (D. Md. Apr. 1, 2020) (Copperthite, J.) (finding that § 3142(i) "relates to temporary release to the U.S. Marshals or other authority for situations such as funeral attendance or other limited specific reasons, not the pandemic outbreak of COVID-19"); *United States v. Moran*, No. SAG-19-0585, 2020 WL 1663366 (D. Md. Apr. 3, 2020) (Copperthite, J.) ("It is this Court's position that 3142(i) is reserved for very limited purposes such as funeral attendance or other law enforcement (USMS) supervised activity, not release during a pandemic."); *United States v. Parker*, No. TDC-18-0344 (D. Md. Mar. 21, 2020) (Chuang, J.) (denying release under § 3142(i) based on risk of contracting COVID-19, even though defendant had diabetes and other serious health conditions); *United States v. Arsenio Cleckley*, TDC-18-0344 (D. Md. Apr. 8, 2020) (Chuang, J.) (denying release under § 3142(i), notwithstanding COVID-19 outbreak at CTF where defendant was housed, where defendant had pled guilty to gun and drug offenses and did not have any "high-risk health conditions").

Courts in other districts have agreed that claims about COVID-19—whether centered on the *risk* of becoming ill from the disease, or unavoidable disruptions in access to counsel during the pandemic—do not constitute compelling reasons justifying temporary release under § 3142(i). *See, e.g.*, *United States v. Chambers*, No. 20-CR-135 (JMF), 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (finding that temporary release was not "necessary" for the preparation of the defense where defendant's pretrial conference was "not even scheduled for another month"); *United States*

*v. Clark*, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (denying release based

on individualized assessment of § 3142(g) risk factors, even though defendant had diabetes, and

finding that "a defendant should not be entitled to temporary release under § 3142(i) based solely

on" COVID-19 concerns); *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D.

Nev. Mar. 27, 2020) (rejecting request for temporary release under § 3142(i), finding that danger

to the community outweighed risk presented by COVID-19 for 60-year-old defendant with

diabetes, and jail's temporary suspension of in-person legal visits did not render release necessary

for preparation of the defense).

Moreover, as in *Green*, the defendant's poor performance on community supervision and

history of refusing to abide by court orders (including his conviction for refusing to abide by a

court-ordered protective order) means that he is unlikely to comply with safety precautions

designed to reduce risk of contracting and spreading COVID-19, just as he is unlikely to comply

with the other conditions of release.  In addition, the proposed third party custodian is not an

"appropriate person" within the meaning of 3142(i) who the court can rely upon to ensure the

defendant's compliance, particularly in light of Pretrial Service's reduced ability to conduct real-

time monitoring.  *See Green*, CCB-19-0539 (D. Md. Apr. 15, 2020).

With respect to preparation of the defense, as discussed above, the detention facility has

not cut off the defendant's access to counsel.  Furthermore, a trial date has not been set, and as a

result of the District of Maryland's standing order postponing all jury trials through June 5, *see*

Standing Order 2020-07, Misc. No. 00-308, ECF 99.  The motions hearing in this case also needs

to be re-scheduled prior to any trial date, so a trial date is likely several months away.

Because the defendant notes that the discovery in this case includes hours of video and

audio recordings and CDF does not have facilities capable of permitting the defendant to review

these recordings on his own, the Government finds it necessary to point out the following: 1.) This discovery was provided to defense counsel on August 21, 2019, over 7 months prior to the COVID-19 pandemic affecting federal detainees; and 2.) There is a discovery agreement in place in this case, dated August 13, 2019, wherein counsel signed and agreed that copies of the discovery materials would not be given to his client or anyone outside of counsel's office, absent prior approval of the Government.  Therefore, this argument in favor of the defendant's release fails.

## **CONCLUSION**

For all of the above reasons, the Government respectfully requests that the defendant's motion be Denied without a hearing.  The defendant has not overcome the presumption that no combination of release conditions will assure the safety of the community if the defendant were to be released. *See* 18 U.S.C. § 3142(e)(3)(D).

<div style="margin-left:auto">

Respectfully submitted,

ROBERT K. HUR
United States Attorney

By:        /s/
Mary W. Setzer
Matthew DellaBetta
Assistant United States Attorneys
36 S. Charles Street, 4th Fl.
Baltimore, Maryland 21201
Mary.setzer@usdoj.gov
410-949-5765

</div>