**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-19-371** |
| | * | |
| **JOSHUA I. LANKFORD,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE
TO DEFENDANT'S MOTION TO SUPPRESS HISTORICAL CELL SITE DATA &
SURREPLY TO DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO
MOTIONS TO SUPPRESS EVIDENCE**

Now comes the United States of America by its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and Mary W. Setzer and Matthew DellaBetta, Assistant United States Attorneys, and files this Surreply to Defendant's Reply to Government's Response to Motions to Suppress Evidence (ECF No. 60), and Response to Defendant's Motion to Suppress Historical Cell Site Data (ECF No. 64), both filed March 11, 2020, almost one month after the government's response to defense motions was due.

**I.      RELEVANT FACTUAL & PROCEDURAL BACKGROUND**

The defendant preyed upon a victim, K.A., whom he knew to be vulnerable and suffering from a severe drug addiction, and lured her into performing commercial sex acts under his direction with the promise to K.A. that he would help her make more money in order to buy a house and attain custody of her son, neither of which he had any intention of assisting with. The defendant told K.A. that she would have to give all of the money she made from the commercial sex acts to him directly. The defendant, after being the sole recruiter and trafficker of K.A. for a period of time, then recruited, one-by-one, Kevonne Murphy ("Murphy), Lakeya Aldridge ("Aldridge), and

1

David Goodwin ("Goodwin"), to join the conspiracy to engage in sex trafficking of K.A.

On or about October 25, 2018, the defendant, Aldridge, and Murphy drove K.A. from Federalsburg, Maryland to Laurel, Delaware, and checked into a hotel room at the Relax Inn. On October 27, 2018, K.A. was then driven to the Sunrise Motel Room in Seaford, Delaware, where she stayed for one day before being driven back to the Relax Inn on or about Sunday, October 28, 2018. K.A. engaged in commercial sexual acts for money at both of these hotel rooms. K.A. was required to give the money she made from the commercial sexual acts to either the defendant, Aldridge, or Murphy. On or about October 29, 2018, K.A. was driven back to Maryland where she performed commercial sex acts and was required to give all of the money to the defendant, Aldridge, Murphy, and/or Goodwin. After one commercial sex act, the defendant, Aldridge, Murphy, and Goodwin became enraged at K.A. for having taken too long at that particular location in comparison to the amount of money she had made, which they felt was not sufficient.

At the direction of the defendant, Aldridge drove the defendant, Murphy, Goodwin, and K.A. to railroad tracks at a very remote location in Federalsburg, Maryland, for the purpose of physically assaulting K.A. as punishment and to maintain her compliance. To prevent K.A. from escaping the vehicle, a belt was placed around her neck while in the vehicle. While parked at the railroad tracks, K.A. was ordered out of the vehicle. K.A. was then beaten with closed fists about her face, torso, and neck. K.A. was also repeatedly and violently struck about her unclothed buttocks with the belt. The defendant and his co-conspirators then immediately transported K.A. to the Relax Inn in Laurel, Delaware, with the defendant and Goodwin gripping the belt around K.A.'s neck throughout the car ride back to Delaware.

Once inside the hotel room, K.A. was not permitted to put on any clothes for the remainder of the evening and was forced to take a cold shower. At one point, at least one other patron of the

hotel came into the room, and the defendant forced K.A., still unclothed, to stand up and spin around so that the gentleman could see her and determine if he wanted to pay the defendant and his co-conspirators to engage in commercial sex with K.A.

During this same evening, on or about October 29, 2019, the defendant initiated the drafting of a list of sex acts that K.A. would be required to perform as things moved forward, and attempted to set prices in order to lend more structure to the enterprise. This sex act list was later recovered during a search of the motel room at the Relax Inn. The list was drafted on the defendant's notepad, which had been in a book bag he carried with him, and contained Goodwin's fingerprints.

On October 30, 2018 at approximately 8:30 a.m., K.A. was able to place a frantic call to 911 by accessing Aldridge's cell phone without her knowledge. While the defendant's motion seems to attempt to minimize the nature of this call, during the 911 call, K.A. is whispering while still inside the room; she is speaking softly and quickly, saying "I need police." The operator even responds, "I can't hear you ma'am, where do you need police?" K.A. quickly responds "Relax Inn, Laurel Delaware, room 20." She even says, "You hear me?" When asked her name, K.A. quietly describes, "I can't say my name, but they beat the shit out of me...please come save me." On the call, K.A. also states, "Listen to me, they're gonna end up trying to kill me so you need to break down this door, I don't know what's gonna happen...could you lie and say you heard there was a disturbance in the room and someone called, please...so they can save me...I'm scared."

Upon arrival at the hotel room, Delaware State Police troopers knocked on the door and Murphy opened the door. Troopers were able to see K.A. standing behind Murphy and indicating that she was in distress. K.A. was wearing only a bed sheet and had visible injuries to her forehead, neck, and jaw. K.A., Murphy, Goodwin, and Aldridge were escorted from the hotel room. Cellular telephones were seized from Murphy, Goodwin, and Aldridge. K.A. was immediately transported

to the hospital for treatment of her injuries.  Lankford had left the hotel room prior to police arrival.

Aldridge, Murphy, and Goodwin were arrested pursuant to valid arrest warrants, and were charged in Delaware with human trafficking and related offenses; a valid arrest warrant also issued for Joshua Lankford. Lankford's arrest warrant affidavit describes that K.A. had described *multiple* individuals trafficking her. The reason for the request for the arrest warrant to be sealed indicates, "victim reported being in fear of her life because the suspect Joshua Lankford was just released after winning a murder trial. The victim believes Joshua will kill her if he finds out she reported the incident."  *See* Page 7, Exhibit 1 to Defendant's Response (Lankford Arrest Warrant). The affidavit notes that Aldridge herself had stated that she was recruited into sex trafficking K.A. *by* Joshua Lankford and was asked to be his enforcer.  Lankford told Aldridge to keep K.A. in line. *Id*. at 5.  The affidavit also describes that after the assault of K.A., Lankford is the one that forced K.A. to lay on the floor naked.  It states that Aldridge advised that Lankford had just been released from prison in reference to a murder and his plan was to start a prostitution business, and that Goodwin had written the sex acts list found in the hotel at the direction of Lankford. *Id*.  The affidavit lays out that Goodwin had advised that Lankford had held K.A. down while Aldridge beat her, and that Lankford had put a belt around K.A.'s neck so that he could control her and prevent her from exiting the vehicle as they drove back to the hotel.  *Id*. at 6.  Goodwin had told investigators that he was scared of Lankford because he had recently been released from prison after winning a murder trial.

The affidavit includes verification that Lankford had been found not guilty of a homicide on August 22, 2018, and notes that this corroborates what Aldridge, Murphy and Goodwin had all stated in their interviews.  *Id*. at 6.  Based on this collective information, and other evidence included in the affidavit, a valid arrest warrant, supported by the ample probable cause described

above, issued for Joshua Lankford at approximately 2:08 a.m. on October 31, 2018.

The defendant was arrested pursuant to the arrest warrant on October 31, 2018 at approximately 11:40 a.m. in Federalsburg, Maryland, by detectives with a Fugitive Task Force. His cellular telephone, a black Motorola, was seized at that time. Cellular telephones had also been seized from Aldridge, Murphy, and Goodwin. After his arrest, Lankford was transported to the Caroline County District Court Commissioner's office, located at 207 S. Third St Denton, Maryland 21629, and had an Initial Appearance that same day, at approximately 1:49 p.m., where he was advised of the pending Delaware charges against him and his rights regarding counsel. The defendant acknowledged this advisement by his own signature, below the words, "I had read to me the offense(s) for which I am charged, the conditions of release, the penalty for violation of the conditions of release, the Notice of Advice of Right to Counsel. I acknowledge receipt of a copy of this form. My Bail Review date is 11/01/2018 at 08:30 am in room 01, at 207 S. Third St., Denton, Maryland 21629." Exhibit 1, page 2. In fact, the defendant signed acknowledgments in four (4) different places after being advised of his rights at his initial appearance on October 31, 2018. *Id*. at 2, 3, 4, 5.

The following morning, at 8:30 a.m. on November 1, 2018, a bail review was held before a District Court Judge. At this hearing, the defendant was again advised of the Delaware charges against him, that he had the right to demand a warrant of extradition, that he had the right to demand and procure legal counsel, and that he had the right to contest the legality of the arrest. The defendant acknowledged the Bail Review Summary with his signature and the date *Id*. at 9, 10. The defendant voluntarily waived an extradition hearing and was ordered committed. *Id*. at 12.

At approximately 11:55 a.m. on November 1, 2018, the defendant gave a voluntary interview to investigators at the Caroline County Detention Center, after being advised of his *Miranda* warnings. During that interview, the defendant acknowledged having already seen a Judge and having been advised of his charges. He was asked something to the effect of, "It was already explained a little bit about the fact that this is a human trafficking case, right?" And the defendant replied, "No, I just **found out today in front of the judge**" but said "the people that picked me up didn't tell me anything." He then further acknowledged awareness of the charges, stating, "I've got three- I got three charges taggin' on with that but go ahead."

During this interview, defendant Lankford admitted that he was in the vehicle as he and his co-conspirators drove K.A. back to Delaware with a belt around her neck. He stated that Aldridge had told K.A. that if she said anything about it, Lankford was already out for murder. Mr. Lankford was asked whether his murder case was used to motivate K.A. to act right, and he agreed that it was. The defendant admitted to receiving money from K.A.'s performing sex acts, but claimed he had severed ties because he was not making enough money. The defendant bragged that he had erased everything off of his cell phone and done a "whole system reboot." He stated, "That phone actually will be all that messages and stuff that you think you gonna get – nah. I knew last time I got in trouble with the law to erase everything." He continues, "They ain't be lookin' for a ghost and I don't have a chip in it. So it wouldn't have nothing."

The very next day, after waiving his right to challenge extradition, a right properly conveyed to the defendant and required to be honored if invoked, Delaware State authorities did extradite Joshua Lankford and transport him to Delaware, where he was then processed and arraigned again.

During the continuing investigation, a Delaware State subpoena request was issued for the toll

records associated with the cellular telephones seized in this investigation.  Toll record analysis showed numerous daily communications in the form of text messages and telephone calls between Lankford, Aldridge, and Murphy from October 25, 2018 through October 30, 2018.  A review of toll records also revealed that the subscriber of Lankford's telephone is Preston Lankford, a purported relative of Joshua Lankford's.  Investigators also found evidence that Lankford and Murphy had communicated via their cell phones after the police had arrived at the hotel and encountered all of the subjects inside.   There was an incoming call to Murphy's phone from Lankford.

On November 26, 2018, Delaware Judge John Hudson of the Sussex County Justice of the Peace Court issued search warrants for cell phones recovered in the case, including the cell phone belonging to Lankford.[1]   Text messages in Murphy's cellular telephone show contact between Murphy's phone and Lankford's cellular telephone regarding K.A., as detailed below:

- On 10/24/18 at 1:49 p.m. (UTC), a message was sent to Lankford from Murphy's phone, stating, "Yo tell bunny they said that's not good enough" This message indicates Lankford was physically with K.A. on 10/24/18.[2]

- On 10/25/18 at 2:35 p.m. (UTC), a message was sent to Lankford from Murphy's phone, stating, "Bruh shawty passingout and shit wats up with her bruh I ain't tryna catch no body over her being stupid deal with her she scaring other money away"

- On 10/26/18 at 7:50 p.m. (UTC), a message was sent to Lankford from Murphy's phone, stating, "Where are you guys cal me asap" Approximately 24 seconds later a phone call was received from Lankford's phone.

- On 10/26/18 at 7:59 p.m. (UTC), a message was received on Murphy's cell phone from Lankford stating, "Are you oka". At around 8:27 p.m. (UTC), Murphy responded, NO." Multiple phones calls were made to Lankford following this message.

---

[1] Despite defendant's response asserting that the defendant's cell phone (and the other seized cell phones) had not been turned over to the Delaware State Police Forensics Unit until January 14, 2019, this is false.  Page 13 of the Search Warrant affidavit clearly indicates that the forensic review of all six of the cell phones seized in the investigation was "concluded" on January 14, 2019.  Ex. 2 to defendant's reply, at 13.

[2] Investigation revealed that the nickname given to K.A. during this sex trafficking enterprise was "Bunny."

- On 10/27/18 at 1:04 a.m. (UTC), a message was sent from Murphy's cell phone to Lankford, stating, "That's a no go bruh she pissed imma try calm her down"

- On 10/27/18 at 1:13 a.m. (UTC), a message was sent to Lankford from Murphy's cell phone, stating, "Bunny got her id but she said she done fam and ahe said she not coming bruh she got tears and all that but imma keep trying". About one minute later, Lankford sent Murphy's phone a message, stating, "This is not the time to quit just let her know that I said that and tell her that I'm not upset for her actions because something positive happen".

On July 9, 2019, Federal Search Warrants issued to search the defendant's black Motorola cell phone, and for historical cell site location data to be received from the cell phone carrier associated with the defendant's known cell phone number. The warrants also sought information associated with the cell phones (content) and cell phone carriers (location information) of Aldridge, Murphy, and Goodwin.

On August 1, 2019, a Grand Jury in the District of Maryland returned a four-count Indictment against Joshua I. Lankford, Lakeya Aldridge, and Kevonne Murphy, charging each of them with Conspiracy to Commit Sex Trafficking in violation of Title 18 U.S.C. § 1594(c), Sex Trafficking, in violation of 18 U.S.C. § 1591(a), (b)(1), Conspiracy to Commit Kidnapping and substantive Kidnapping, in violation of 18 U.S.C. § 1201(a) and (c). On August 5, 2019, after a full detention hearing, the defendant was ordered detained during the pendency of this case.

The cell site location information received pursuant to the valid Federal Warrant issued on July 9, 2019 was corroborative of the other evidence in this case; that is, that the defendant was present during the assault of K.A. and the sex trafficking of K.A. in both Maryland and Delaware.

On March 12, 2020, a Grand Jury for the District of Maryland returned a ten (10) count Superseding Indictment against the defendant, adding multiple counts of Coercion and Enticement, in violation of 18 U.S.C. § 2422(a), Transporting an Individual in interstate commerce to Engage in Prostitution, in violation of 18 U.S.C. § 2421, and Interstate Travel to Promote Enterprise

Involving Prostitution Offense, in violation of 18 U.S.C. § 1952(a)(3).[3]

On May 4, 2019, the defendant filed a motion to reopen detention hearing and for pretrial release (ECF No. 71). After a response by the government, and reply by the defendant, Judge Gesner issued a thorough memorandum and order denying the defendant's motion for release on June 5, 2020, noting that "While it appears that the government and defense will present different versions of the facts as this case progresses, the evidence presented to the court at this stage is very strong and the violent nature and circumstances of this offense, supports, rather than rebuts, the presumption in favor of detention on the basis of danger to the community." (ECF No. 88)

## II.    ARGUMENT

### A.  Defendant's November 1, 2018 statement was Voluntary, *Mirandized*, and occurred AFTER the Defendant had already been presented to a judicial officer on two separate occasions

#### 1.  At no point did the Defendant unequivocally invoke his right to remain silent

After being advised of his *Miranda* warnings, and directly asked whether he wished to talk to the investigators, the defendant first clearly stated "**I would like to hear y'all out.**" The defendant stated he didn't know what the investigators were asking about, and Detective Kristunas stated that they would have to ask him the questions for him to know. The defendant replied, "mmhm," indicating that he understood that and was ready to proceed.

Despite this response and the defendant's indication of understanding his rights and the process, out of the abundance of caution, Detective Kristunas again asked the defendant whether he wished to talk to investigators; the defendant slowly and seemingly confusedly said something to the effect of "uhhh….no" or "I don't know." Because of the confused, completely

---

[3] Co-Defendant Lakeya Aldridge was also charged in the Superseding Indictment with additional counts involving the offenses of Coercion and Enticement, in violation of 18 U.S.C. § 2422(a), Transporting an Individual in interstate commerce to Engage in Prostitution, in violation of 18 U.S.C. § 2421, and Interstate Travel to Promote Enterprise Involving Prostitution Offense, in violation of 18 U.S.C. § 1952(a)(3).

equivocal nature of this response, and especially in light of his clear response just moments prior about wanting to hear the officers out, Special Agent Medina continued to try to explain the process to the defendant in a cordial, unintimidating manner and tone. This is extremely clear when listening to the audio recording of the interview, and becomes even clearer based on the context of the defendant's then unequivocally responding, "**Oh, I'm willin' to speak**" and "**Yes, I can hear y'all out**" prior to the interview getting underway.

Whether an invocation is equivocal is based upon a reasonable person standard, and takes into account the circumstances. *Davis v. U.S.*, 512 U.S. 452, 459 (1994). The Court in *Davis* explained that if a makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect **_might_** be invoking the right to counsel, the cessation of questioning is not required. *Id*. The Court discussed the requirement of ceasing questioning upon an unequivocal reference to an attorney, noting that "when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.'" *Id*. (quoting *Michigan v. Mosley,* 423 U.S. 96, 102 (1975)).

In this case, the officers reasonably did not know whether the defendant was invoking his right to remain silent, given his previous clear, unequivocal answer, and then the soft-spoken, muddled, equivocal response that followed. Therefore, it was reasonable for them to attempt to clarify. The investigators further demonstrated their reasonableness and honest intentions of clarifying the defendant's equivocation when moments later the defendant started with what seemed like it would be an inculpatory statement, saying, "About my involvement…" and they

interrupted him, not allowing the defendant to say something potentially incriminating, saying, "I need to make sure that you're willin' to talk to us, that's all. That's why we want…" The defendant interrupted this and clearly stated, "Oh, I'm willin' to speak." Yet, the detective clarified yet again prior to beginning any questioning, asking if the defendant wanted to speak, and the defendant unequivocally replied, "Yes, I can hear y'all out." This is precisely the conduct by law enforcement that is encouraged in response to something they reasonably perceive to be, at most, an equivocal statement. The *Miranda* safeguards are not intended to become wholly irrational obstacles, with no consideration of the human beings who are forced to immediately interpret a person's subjective intent and meaning.

### 2. Prompt Presentment

While the defendant cites to Delaware statutory prompt presentment authority for arrests which occur in Delaware State, claiming the defendant "should have been swiftly transported to Delaware to be presented to a Delaware Judge," he fails to acknowledge the impact of the extradition statutes of both Maryland and Delaware. The defendant does acknowledge in a footnote of his response (footnote 7) that the defendant "may have been brought before a Commissioner or Jude of the District Court of Maryland" but claims that instead he should have been promptly brought to Delaware. This is false and would have been a violation of the defendant's own rights.

The defendant was arrested in Maryland on October 31, 2018. Md. Code Crim. Pro. 9-110 provides (emphasis added):

> (a)(1)  A person arrested upon a warrant issued under § 9-107 of this title **may not be delivered over to the agent whom the executive authority demanding the person has appointed to receive the person** *unless* the person is **first taken forthwith before a judge of a court of record** *in this State*, who shall inform the person:

(i)  of the demand made for surrender;
(ii)  of the crime charged;  and
(iii)  of the right to demand and procure legal counsel.
(2)  If the person arrested or the person's counsel shall state a desire to test the legality of the arrest, the judge shall fix a reasonable time within which the person can apply for a writ of habeas corpus.
(b)  When the writ is applied for, notice thereof and of the time and place of hearing thereon shall be given to the prosecuting officer of the county in which the arrest is made and in which the accused is in custody, and to the agent of the demanding state.
(c)  If the application for a writ of habeas corpus after an extradition hearing only is denied by the trial court, the denial may be appealed to the Court of Special Appeals.

The defendant appears to claim that the defendant should have been brought to Delaware immediately and in spite of this statute, with no authority for this argument. Notably, the State of Delaware has a similar statute applicable to someone arrested in Delaware and charged with having committed a crime in another State. 11 Del. C. 1953, § 2510 provides:

**No person arrested upon such warrant shall be delivered over to the agent whom the executive authority demanding the person has appointed to receive the person *unless* the person is first taken forthwith before a judge of a court of record or a justice of the peace *in this State*,** who shall inform the person of the demand made for the person's surrender and of the crime with which the person is charged, and that the person has the right to demand and procure legal counsel. If the prisoner or the prisoner's counsel states that the person or they desire to test the legality of the prisoner's arrest, the judge or justice of the peace shall fix a reasonable time to be allowed within which to apply for a writ of habeas corpus. When such writ is applied for, notice thereof, and of the time and place of hearing thereon, shall be given to the Deputy Attorney General of the county in which the arrest is made and in which the accused is in custody, or to the Attorney General or the Chief Deputy Attorney General, and to the agent of the demanding state.

The defendant boldly claims a nefarious motive for law enforcement detaining him initially in Maryland, where he was arrested, prior to his extradition to Delaware; he alleges that

it may have been an effort to circumvent Delaware's prompt presentment statute. This plainly ignores the statutory authority that law enforcement was required to follow regarding extradition, based on the location of the defendant's arrest, and the safeguard of the defendant's rights to challenge such extradition.

In any event, the government acknowledges that federal presentment rules apply where state officers are acting at the direction of or in concert with the federal officers, or where there is collaboration between the federal and state authorities, as there was in this case.

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, **or before a state or local judicial officer**," with limited exceptions (emphasis added).

Additionally, 18 U.S.C. § 3501(c) provides that a law enforcement officer's **delay in bringing an arrestee before a judicial officer** may be excused "if the confession was made voluntarily and 'within six hours' following the arrest or other detention." *United States v. Alvarez–Sanchez*, 511 U.S. 350 (1994) (quoting 18 U.S.C. § 3501(c)).

The Fourth Circuit has confirmed in *United States v. Claridy*, 601 F.3d 276, 284–85 (4th Cir. 2010) that "a confession must be suppressed if (1) it was made prior to the arrestee's presentment to a magistrate judge; (2) the presentment to a magistrate judge was unreasonably or unnecessarily delayed; and (3) the confession was made more than six hours after the arrest or detention" (citing *Corley v. United States*, 556 U.S. 303, 321–22, (2009)).

Because Lankford's rights were strictly honored and he was almost immediately presented to a judicial officer after his arrest on October 31, 2018, and had another hearing in front of a District Court Judge on November 1, 2018, which were both prior to any attempted

interview by investigators, the passage of time prior to the defendant's interview is of no moment. The threshold requirement of prompt presentment was met, and thus if the defendant had been interviewed 10 days, or even 20 days, after his arrest, it would still be permissible, as there is no "delay" in presentment for which to analyze the reason.

### 3. Voluntariness

The cordial and casual nature of the entire exchange that ensued during the November 1, 2018 demonstrates its voluntariness. The only argument the defendant seemingly makes in arguing its lack of voluntariness is that at some point an investigator noted to Lankford that his charges were "on a big different level." This was said by Special Agent Medina as an attempt to help the defendant understand what human trafficking is in relation to prostitution, not to be intimidating. Special Agent Medina continues his thought, "and- basically, that's what we want to talk about is your involvement, okay?...I'm gonna be straight up with you." Not only is this NOT a threat, but an explanation, but it certainly does not overbear the defendant's will or capacity for self-determination, as is required to render a confession involuntary. *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir. 1997)(internal citations omitted).

The voluntariness of the interview is further demonstrated by exchanges such as follows: The defendant asks, "So what happens if you're - you're hint or your clue or whatever you tracking on paper…really does find me not guilty. What are you gonna say to the State?" The investigator responds, "Well if you're not guilty then you're not guilty. But I don't believe – I think with the evidence that we already have that yes, we can prove that you're somewhere in here." This is honest, unintimidating, and contains no express or implied threat or promise.

### B. The Search Warrants for the Defendant's Cell Phone and Historical Cell Site Location Information were Lawfully Issued

#### 1. The Warrants to Search the Defendant's Cell Phone

### i.  The Delaware Warrant  Application Articulated Ample Probable Cause

The affidavit of Probable Cause includes  information  that K.A. would use defendant Lankford's cell phone to arrange some of the commercial sex dates. *See* Exhibit  2 to Government Response, page 8.  The affidavit further explains  that the defendants had each other saved as contacts in one another's phones, and provides the information  K.A. gave about under what name/nickname  they were saved in each other's phones, indicating  that she knew this information  because the co-conspirator sex traffickers communicated  via their phone in her presence about the enterprise. *Id*. at 10.  It further details the admissions  of the other defendants as to communicating  via their phones about the sex trafficking  of K.A.

There was clearly far more than even a "fair probability"  based on the affidavit that Lankford's phone contained evidence of the offenses for which he was charged.  The Fourth Circuit has rarely found even a search warrant based on an informant  tip to be inadequate,  and in this case, the information  within the affidavit was provided  by multiple  known, named, individuals.  S*ee, e.g. United States v. Blauvelt*, 638 F. 3d 281, 287-88  (4th Cir.), *cert. denied*, 565 U.S. 823 (2011).

### ii.  The Federal Warrant  Affidavit  Contained only Accurate Information in Support  of Probable Cause

The defendant claims that the Federal Search Warrant stated that the cell phone was seized from his person.  This is not true of the affidavit which lays out the probable cause for the Magistrate Judge.  When listing  the target devices on page 3 of the affidavit, the black Motorola is described, as having  been "seized from the residence of Joshua Lankford, 3448 Holland  Drive, Federalsburg,  MD, on October 31, 2018." Exhibit  3 to Defendant's Reply, at page 10. Furthermore, when the probable cause is being described, the affidavit  specifically notes in

paragraph 24 that the cellular telephone "was observed on the living room couch" of the residence at which Lankford was arrested. *Id.* at 17. Therefore, the argument that the Magistrate Judge was misled and the warrant would not have issued had the Judge known that the cell phone was not seized from the defendant's person falls completely flat.

As the defendant rightly notes, *U.S. v. Patane* stands for the very proposition that the *physical fruits* of a *Miranda* violation are not subject to the exclusionary rule, even if the statement of the defendant himself is excluded.  542 U.S. 630, 637 (2004).  In *Patane*, the Court concluded that Defendant's demonstration of her passcode after requesting an attorney is subject to suppression for violation of *Miranda*, but the contents of the phone which were accessed by virtue of the passcode demonstration are not subject to suppression.  Without evidence of coercion or a denial of due process in elicitation of the statements, the object of the exclusionary rule is not served by barring admission of the derivatively obtained evidence. *Id.* (quoting *United States v. Gonzalez-Sandoval,* 894 F.2d 1043, 1048 (9th Cir. 1990)).

### iii.   The timing of the Search Warrant was appropriate and is not the sole consideration under *Pratt*

A seizure that was lawful at its inception "can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen,* 466 U.S. 109, 124 (1984).  Thus, to determine if a seizure was reasonable, courts balance privacy-related and law enforcement-related interests.  *Illinois v. McArthur,* 531 U.S. 326, 331 (2001) (citing *Delaware v. Prouse,* 440 U.S. 648, 654 (1979).  This same balancing applies in determining whether an extended seizure of property violates the Fourth Amendment.  *Pratt,* 915 F.3d at 271 ("To determine if an extended seizure violates the Fourth Amendment, we balance the

government's interest in the seizure against the individual's possessory interest in the object seized.").

The "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" not perfection. *United States v. Burton*, 756 F. App'x 295, 300 (4th Cir. 2018) (unpublished) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). There is no bright line rule that a delay in obtaining a warrant of a particular length is *per se* unreasonable. Rather, "[t]he reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis." *Thomas v. United States*, – F. – App'x, 2019 WL 2158775, at *12 (11th Cir. May 17, 2019) (33 day delay reasonable).

For this reason, when the individualized facts and circumstances so dictate, federal and state courts across have repeatedly concluded that periods of time ranging from approximately one month to up to 20 months between seizure and obtaining a warrant did not warrant suppression. *See, e.g.*, *United States Laist*, 702 F.3d 608 (11th Cir. 2012) (25 day delay reasonable); *United States v. Vallimont*, 378 F. App'x 972, 976 (11th Cir. 2010) (unpublished) (45 day delay reasonable); *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (three month delay reasonable); *United States v. Christie*, 717 F.3d 1156, 1163 (10th Cir. 2013) (five month delay reasonable); *United States v. Williams*, No. CR418-147, 2019 WL 1612833, at *2 (S.D. Ga. Feb. 27, 2019) (four month delay reasonable); *New York v. Magee*, 135 A.D. 1176, 1180 (N.Y. Sup. Ct. App. Div. 2016) (four month delay reasonable); *King v. State of Texas*, No. 03-17-276, 2018 WL 5728765, at *9 (Tex. Ct. of App. Nov. 2, 2018) (20 month delay reasonable).

Here, balancing defendant's negligible possessory interest in his phone against the government's interest in it, and based on all of the facts and circumstances, the delay in obtaining a warrant for Defendant's phone is not unreasonable and suppression is therefore unwarranted.

Regarding the weight of *this* defendant's possessory interest in the phone, it is negligible at best. He attempted to remotely erase all data from the phone—contacts, text messages, phone calls, and more—attempting to vitiate that which makes the phone most valuable and that which formed the basis of his possessory interest in to begin with: The phone's contents. He had functionally abandoned his possessory interest in the phone.

During his November 1, 2018 *Mirandized* interview, the defendant bragged that he had erased everything off of his cell phone and done a "whole system reboot." He stated, "That phone actually will be all that messages and stuff that you think you gonna get – nah. I knew last time I got in trouble with the law to erase everything." He continued, "They ain't be lookin' for a ghost and I don't have a chip in it. So it wouldn't have nothing."

Defendant's possessory interest in his phone derives from *its contents* and not the physical phone itself. *See United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) ("*Since the possessory interest in a computer derives from its highly personal contents*, the fact that Laist had a real opportunity to copy or remove personal documents reduces the significance of his interest.") (emphasis added); *cf. Riley v. California*, 573 U.S. 373, 395 (2014) ("A phone not only contains in digital form many sensitive records previously found in the home; it also contains *a broad array of private information* never found in a home in any form—unless the phone is.") (emphasis added); *Pratt*, 915 F.3d at 271-72 (reasoning that an individual diminishes his possessory "interest if he consents to the seizure or voluntarily shares *the seized object's contents*") (emphasis added).

"[I]f the person from whom the item was seized lacks a cognizable possessory interest in the item, that person's Fourth Amendment rights are not violated by even a lengthy period between seizure and the procurement of a warrant." *United States v. Sparks*, 806 F.3d 1323, 1340 (11th Cir. 2015). "That is so because any delay—no matter the length—cannot interfere with possessory

rights that do not exist." *Id.*; *see Williams*, 2019 WL 1612833, at *5 (defendant abandoned any possessory interest he had in contents of phone where phone was left in car and the "*phone's contents were completely unsecured*" in light of the fact that the phone was not password protected) (brackets in original) (emphasis added).

By attempting to remotely wipe the phone and permanently remove its contents entirely, defendant evinced an intent to remove that which formed the basis of his possessory interest in the phone to begin with. In other words, his attempt to wipe the phone amounted to his abandonment of it. And it matters not whether the defendant was ultimately unsuccessful in his attempt to erase his phone. What matters is that *he intended to do so*. *See id.* ("The determination of abandonment, while not dependent on the technicalities of property law, is objective, and based primarily on the prior possessor's intent, as discerned from statements, acts, and other facts.") (citation and internal quotation marks omitted); *see also* Ex. 4 (*Dorsey*) at 13.

At bottom, defendant's attempt to destroy the contents of his phone amounts to a modern day version of, for example, throwing contraband out of a moving vehicle while being pursued by police or directing a third party—here, Apple—to destroy property, so that it cannot be recovered by law enforcement. *See United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir. 1977) (defendants abandoned property and lacked standing to challenge seizure of negatives and paste-ups at print shop where they told a third-party, a government informant, to destroy negatives and paste-ups, but the informant did not do so).

Defendant's actions thus amount to the functional abandonment of his phone and nullified his possessory interests in it. By contrast, the government's interest in the phone is significant.

During the period of time before the warrant was obtained, defendant never asked for his phone back from law enforcement, despite engaging in a lengthy interview colloquy with the

19

investigators. This also heavily diminished defendant's possessory interests in his phone.

"The failure to make a request for return of the cellular telephones during the period of delay undermines Defendant's claim that his Fourth Amendment rights were impacted." *United States v. Brantley*, No. 1:17-CR-77-WSD, 2017 WL 5988833, at *3 (N.D. Ga. Dec. 4, 2017) (concluding that interference with defendant's interests in phone was minimal in light of defendant's failure to seek return of the phone before warrant obtained for it); *see also United States v. Johns*, 469 U.S. 478, 487 (1985) (noting that defendants who never sought return of the property could not show that delay adversely affected Fourth Amendment rights); *United States v. Morgan*, 713 F. App'x 829, 831 (11th Cir. 2017) ("Additionally, there is no evidence that Morgan ever asked for the cellphone to be returned."); *Stabile*, 633 F.3d at 235 (concluding three-month delay in obtaining a warrant was reasonable, among other reasons, because defendant did not request return of his hard drive until 18 months after the initial seizure); *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ("[I]t can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it.").

Defendant hangs his hat on *Pratt* in support of his contention that suppression is warranted due to the timing of the search warrant. *Pratt* is inapposite. For starters, the defendant there immediately and affirmatively asserted his possessory interest in his phone. 915 F.3d at 270. Further, the seizure of the phone at issue in *Pratt* occurred before the defendant there had been charged with any crime. *Pratt*, 915 F.3d at 270. Finally, to the extent Defendant claims that *Pratt* stands for the proposition that a purported delay beyond a certain period of time is dispositive, he is wrong. As noted above, there is no bright line past which a delay becomes unreasonable. The Fourth Circuit confirmed as much in *Pratt*, noting merely that the competing interests of the defendant and the government are to be balanced. *See Pratt*, 915 F.3d at 271 ("To determine if an

extended seizure violates the Fourth Amendment, we balance the government's interest in the seizure against the individual's possessory interest in the object seized.").

*Finally*, though he argues for suppression of the phone, defendant fails to address whether the good faith exception applies—and it does. This is yet another reason the Court should deny defendant's Motion.

"Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011) (internal citations omitted). Accordingly, suppression is a remedy of "last resort." *Id.* It is appropriate only when necessary to deter police misconduct. *Id.* at 237-40, 246; *Leon*, 468 U.S. at 916. Courts should not "suppress evidence obtained as a result of nonculpable, innocent police conduct." *Davis*, 564 U.S. at 240. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Here, there was no such misconduct by law enforcement.

### 2. The Federal Warrant for Historical Cell Site Location Information was Proper

The only argument offered by defendant for suppression of the cell site data appears to be based on the timing of the issuance of the warrant, with the defendant boldly concluding on page 26 of his reply without a shred of authority that the timing was "unreasonable and the fruits of the searches must be suppressed." The defendant's motion to suppress historical cell site data provides no further clarity, simply stating, "For the reasons noted in the Defendant's Omnibus Reply to pending Motions, the warrant shouldn't have issued."

The government correctly sought a search warrant before acquiring such records. These records were obtainable regardless of a physical seizure of a cell phone, which is evidenced by the numerous situations wherein the government covertly seeks historical cell site location from a cell phone carrier for a cell phone number believed to be operated by someone who has committed, or is committing a crime, and under circumstances where the government has not had direct contact with the person and has not seized their cell phone. A known International Mobile Subscriber Identity/Electronic Serial Number (IMEI) number is not required in order to obtain such data. One must simply have the phone number. However, here, the IMEI number was obtained completely independently of the seizure of the phone--via toll records received from AT&T. The defendant's cell phone number was obtained entirely independently from the seizure of the phone--via statements of co-conspirators and victim K.A. about the sex trafficking communications within other cell phones and how defendant Lankford's number was saved within those phones.

For the reasons described *supra*, neither the defendant's statements to law enforcement nor the seizure of the defendant's cell phone were unlawful, and neither should be suppressed. But even when excising defendant's statements from the warrant affidavit and the details about the circumstances about seizure of the phone, there exists more than ample probable cause to obtain the cell site location information.

Further, the doctrines of "inevitable discovery" and "independent source" are instructive and related to this point. Under the "inevitable discovery" doctrine, improperly seized evidence may nevertheless be admitted if the information "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Similarly instructive, evidence that is initially discovered or seized unlawfully may nevertheless be admissible if later

acquired through a lawful "independent source." *Murray v. United States*, 487 U.S. 533, 537 (1988); Silverthorne Lumber Company v. United States, 251 U/S. 385, 392 (1920)(recognizing that even illegally obtained facts are not "sacred and inaccessible" and that "[i]f knowledge of them is gained from an independent source they may be proved like any others").

The defendant's cell phone number and carrier, which is all that is required to obtain historical cell site location information from a provider, would have been discovered and *were indeed discovered* independently of the seizure of the defendant's cell phone, and inevitably upon the issuance of the subpoena for toll records. This subpoena was issued early in the investigation by the Delaware State Police *in addition to* the warrant to search the defendant's phone. Further, the cell site warrant requested location information associated with the cell phone numbers for the other defendants in this investigation as well.

Therefore, it cannot reasonably be argued that any information learned particularly from the seizure of defendant Lankford's phone affected law enforcement officers' decision to seek the warrant for cell site information associated with his phone, because they sought information associated with other lawfully obtained cell phones/cell phone numbers as well.

There is absolutely no authority whatsoever for suppression of the historical cell site data, regardless of whether this Court determines that suppression of any other evidence in this case is warranted.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that the Court deny Defendant's motions.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____
    Mary W. Setzer
    Matthew DellaBetta
    Assistant United States Attorneys